FILED: 9/18/2024 10:18 AM
72-4-20 Ancv

## STATE OF VERMONT

**SUPERIOR COURT**                                        **CIVIL DIVISION**
**ADDISON UNIT**                                          **Docket No. 72-4-20 Ancv**

**AERIE POINT HOLDINGS, LLC,**
    **Plaintiff,**

    **v.**

**VORSTEVELD FARM, LLP,**
    **Defendant**

### Decision: Motions for Contempt

**Motion to Find Defendant in Contempt of Court and Enforce August 15, 2022 Judgment (Motion #20), and Plaintiff's Supplemental Motion for Coerceive Sanctions (Motion #32)**

Plaintiff seeks sanctions for contempt and enforcement of an injunctive judgment issued by the court on August 15, 2022, based on a Decision of March 28, 2022, in which the court found that Defendant Farm had committed trespass and nuisance against its downslope neighbor Plaintiff Aerie Point by increasing the volume and velocity of water discharged into two streams that crossed Plaintiff's land. This occurred as a result of the installation of an extensive tile drainage system on Defendant's farmland resulting in the discharge of water in a manner that caused damage in a number of ways, including erosion of land and deposits of sediment and phosphorous.

The Injunction that issued is as follows:

Defendant is enjoined from allowing water, and any particles it carries, from flowing from the discharge points of Defendant's drain tile system into the public ditches and culverts westerly of Defendant's land on Arnold Bay Road between Adams Ferry Road and Pease Road.

A hearing was held on the Motion for Contempt in December of 2023. A Decision issued on January 8, 2024, finding Defendant in contempt and finding Plaintiff entitled to attorneys' fees. The Motion remained pending based on the parties' agreement to go to mediation. After mediation was not successful, Plaintiff filed the Supplemental Motion requesting a further hearing on the issue of contempt and additional attorneys' fees as well as coercive sanctions.

A hearing was held on July 17 and 30 and August 2 and 27, 2024, which was a continuation of the hearing on the original Motion for Contempt, as well as a hearing on the Motion for Coercive Sanctions. On July 17th, prior to taking evidence at the courthouse, the undersigned took a site visit. In attendance were Dennis Hopper on behalf of Aerie Point with Attorney Merrill Bent, and Gerard Vorsteveld and Hans Vorsteveld on behalf of the Farm with

1

Attorneys Claudine Safar and Miles Stafford. The site visit lasted from 9:00 am to approximately 1:15 pm. Participants and the undersigned walked throughout both the Farm property and Aerie Point property and observed all the tile drain discharge points, mitigation measures undertaken by the Farm, water flow into the ditch on Arnold Bay Road and through the culverts, and overall water flow on the properties of both parties. No testimony was taken. Attorneys pointed out features for the court to observe about which there would be testimony in court.

On July 10, 2024, Hurricane Beryl crossed over Addison County as it moved northeast, causing extremely heavy rains that resulted in widespread flooding and culvert and road washouts and a FEMA disaster declaration. During the taking of evidence on July 30th, the court stated on the record that because this was an unusual widespread natural disaster, evidence of what occurred on the parties' properties as a result of the July 10th storm would not be considered by the court. Plaintiff then withdrew from evidence some previously-admitted exhibits that were photos related to that event.

## Findings of Fact

The court hereby incorporates all of the Findings of Fact set forth in the Decision of January 8, 2024, as if fully set forth herein. Additional facts based on events after December 14, 2023, (the last day of the first hearing) are as follows.

Since December of 2023 and the Decision of January 8, 2024, Mark Bannon has continued to work with the Farm on both the EPA plan and in relation to the Injunction. The Farm has implemented some mitigation measures pursuant to his plan.

In February, stone interceptors, or corridors of stone, were installed on the ground below some discharge outlets and at other sites to slow the water flow. They are made of limestone, which is intended to change the pH of the water over a period of years.

The parties participated in a mediation session in March. In March and April, Mark Bannon and Dori Barton visited the Farm property to work primarily on the EPA project.

The Farm again planted corn in the spring on its 250 acres. It purchased a new high-tech planter for $400,000 and planted an increased number of corn plants over the prior year. It also planted some "filter strips" at various points in the corn fields. These are swaths of grassy areas intended to stabilize the soil to prevent erosion. Vegetation buffers were also planted at some locations.

In April, attorneys for the parties participated in oral argument before the Vermont Supreme Court on an appeal of this court's denial of the Farm's Motion for Relief from Judgment. The Farm relies on a comment made by Aerie Point's attorney during the hearing to support its current interpretation of the Injunction, as described below.

In April and May, "silt sox" were placed at various locations on the Farm property. These are cylinders of filled cloth several feet long that are placed laterally and designed to slow the water and retard sediment from going downhill. Mr. Bannon testified that he believes they have

2

impeded sediment to some degree, as he has seen biomass at the underside of some of the silt sox. However, above Culvert #1, which runs from the ditch to the south part of Aerie Point land, three silt sox were "blown out" by the high speed of the water passing through.[1]

By May 15th, mediation had been completed without resolution. Later in May, the Vermont Supreme Court affirmed the denial of the Motion for Relief from Judgment.

In June, Mr. Bannon revised his plan to include installing "spreaders" or "splitters" at some discharge points. These are apparently pipe devices in the shape of a Y to be placed at the discharge outlets to shift the water away from running directly downhill. The "hope" is that some of the water will percolate into the ground and some will spill into basins and evaporate. So far this is a concept only, because these spreaders or splitters have not yet been designed. Gerard Vorsteveld testified that he hoped to have them installed by Thanksgiving. Mr. Barton noted that installation would require an excavator, which could not happen with snow on the ground. This means no installation would occur until next year. These spreaders or splitters are not intended for all discharge outlets. It is unknown to what extent these devices will change the water flow or cause some water to evaporate.

There was a rainfall on July 16th. The court's site visit was July 17th.

On July 22, 2024, Mr. Bannon conducted four water tests. The first was a test of the water that came out of one of the 17 tile drain discharge outlets. It looked clear as opposed to murky. Test results showed that phosphorous and sediment levels were low. The second and third tests were of the water above and below one of the silt sox installations near the most northerly culvert (Culvert #3) leading to Aerie Point land, and showed reduction of both phosphorous and suspended solids, indicating some beneficial effect from the silt sox. The fourth was a test of the water in Lake Champlain below the high water mark where the water from Aerie Point land empties into Arnold Bay. Mr. Bannon was satisfied with the levels of phosphorous and suspended solids resulting from these tests. His view was that the water at all four sampling points was "basically clean."

In sum, the mitigation efforts that the Farm contends are sufficient to comply with its understanding of the requirements of the Injunction have all been implemented except for the design and installation of the splitters or spreaders.

Despite the probability that the mitigation measures may have had some effect in holding back some sediment and phosphorous and possibly slowing down the rate of some of the downhill flow of water, the effect of the tile drain discharges on Aerie Point land is essentially unchanged. Prior to the tile drain installation, the two streambeds on Aerie Point land were shallow and narrow, and carried only natural runoff from upslope land during snowmelt and

---

[1] There are three culverts that carry water from the ditch on the pertinent section of Arnold Bay Road (the section between Adams Ferry Road and Pease Road) through the culverts under Arnold Bay Road to Aerie Point land. Culvert #1 is the southernmost, and is west and downslope of the 10.4-acre EPA wetlands project area. Culverts #2 and #3 carry water to the northern part of Aerie Point land. The water coming through them joins together to form the northern streambed described in this and prior decisions.

intermittently during rain events. Other than those times, water did not run in the streambeds and one could walk across them.[2] The streambeds generally dried out in the summer.

Now, year-round, whenever it rains more than a drizzle, water begins to run through both of the streambeds on Aerie Point land. Although the flow begins modestly, after a period of time, it starts gushing rapidly at a high velocity and with such force that at times it would be dangerous for a person to walk through it. This can last for some hours. The water that gushes through during this time is brown and murky and sometimes foamy as it emerges from the culverts under Arnold Bay Road on to Aerie Point land. It can flow in a stream several feet wide. The southern streambed was only 8" deep and one foot wide as it neared Lake Champlain before the tile drain installation. Now it is 5-6 feet deep, and a 10-foot-long wooden bridge has been installed to cross it. The force of the water continues to erode the sides of the deepened channel. In the northern streambed on Aerie Point land, the flow sometimes cuts into the ground, creating and/or deepening water channels.

The effect of these runoffs is to create two small rivers across Aerie Point land that bifurcate the property into three sections such that at times one cannot cross from one portion of the property to another on foot, but must go out to the road to enter another section. Silt continues to flow into Arnold Bay and White Bay from the water running across Aerie Point land. Between rain events, the water coming through the culverts can be a clear trickle, but the harmful effects of water from the tile drain system occur on a regular basis with rainfalls.

It appears that the tile drain system may be operating as it was designed: to remove water that would otherwise seep into the ground in order to lower the water table for the benefit of corn growth;[3] the water is then flushed out through the tile drain pipes and sent downslope. The mitigation measures now in place have not prevented the effect on Aerie Point land of having rainfalls result in brown murky foamy water shooting out of the culverts in powerful streams that erode and divide Aerie Point land and probably still carry sediment and phosphorous. These effects occurred as a result of the rainfall on July 16th, the day before the site visit. There is no evidence that this was an extraordinary rain event. On July 17th, the water was still running through the culverts at a reasonably rapid rate and was brown. There was foam in the water as it emerged from Culvert #1 on to Aerie Point land. The court does not doubt the results of the water tests that took place on July 22nd, which was almost a week after the most recent rainfall. However, the test results do not mean that those measurements reflect the composition of all of the water that flows to Aerie Point land all of the time. The evidence does not show what the water quality is during the flushing events that occur with rainfalls.

The Farm introduced credible testimony that the amount of rain that falls has increased in recent years. For example, the total rainfall in July of 2024 is equal to the full year totals of 2022 and 2023. That does not absolve the Farm of responsibility for the manner in which it has

---

[2] See Decision of March 28, 2022, Findings of Fact, page 2.
[3] See Decision of March 28, 2022, Findings of Fact, page 9-10.

changed the natural flow of the water that comes from each rainfall by artificially increasing the flow in a manner that causes injury to the downslope land of Aerie Point.[4]

On the Farm's upslope land, at some of the tile discharge outlets, the water coming out of the pipes appears clear. On the site visit, Gerard Vorsteveld captured clear water at some of these points in a glass cup and drank it. He testified that he did not get sick. However, by the time water discharged from the tile drains gets down to the ditch on the Farm side of Arnold Bay Road, the water that enters the ditch during rainfalls is generally brown and murky, and some is foamy. Anna Hopper testified credibly that in the winter, when there are no leaves on the trees, one can see the water from the uphill discharge points flow down the slope through the streambeds toward the ditch and enter the ditch as brown, murky water. The court previously found that the brown murky water contained sediment and phosphorous. The test results done on July 22nd are not sufficient to prove that the water that continues to flow onto Aerie Point land periodically in large quantities no longer contains sediment and phosphorous. The fact that the force of the water going through Culvert #1 blew out three silt sox, which were placed there to collect sediment, suggests that it probably does.

Both Mr. Bannon and Ms. Barton have continued to work on the EPA enforcement action, which appears to be the Farm's priority. The wetlands that are the subject of this action consist of 10.4 acres located above the southern part of Aerie Point property and involve four discharge outlets (##1–4) that send water to the most southerly culvert (Culvert #1). The evidence about that action is that three monitoring wells have been installed to monitor high and low water levels over the next year. The proposal is apparently to move a few of the tile drain discharge outlets to direct flow of water from those outlets into the wetlands, but with no action to take place until after the results of the monitoring period, which ends in the summer of 2025. The water from the four discharge outlets currently flows downhill in the southern streambed, into the ditch, and through Culvert #1 onto Aerie Point land, carrying brown, murky, foaming water with force strong enough to prevent a person from walking through it.

There is no specific evidence about the status or terms of the EPA action (e.g., whether there is an approved plan or stipulated agreement and what its proposed or fixed terms are). The Farm's witnesses vaguely imply that the EPA action has priority over the Injunction such that nothing can be done on that portion of the Farm property, but there is no factual proof that this is so, nor has any credible legal argument been made to support such a proposition. There is no evidence of efforts on the part of the Farm to work with EPA compliance officials to coordinate that project with Injunction compliance.[5] It is difficult to imagine that even if the EPA has superior authority over some of the water discharged from the tile drains, its officials would require noncompliance with the Injunction such that brown murky runoff from the Farm will run

---

[4] See Vermont Supreme Court cases quoted and cited on page 26 of the March 2022 Decision: "As a general proposition, an upper property owner cannot artificially increase the natural flow of water to a lower property owner or change its manner of flow by discharging it onto the lower land at a different place from its natural discharge. . . But, in cases involving only increased flowage and not a change in the place of discharge, an upper owner may increase the flow *as long as it causes no injury to the lower property*." (Emphasis added.)

[5] There is some evidence that Mr. Bannon discussed the idea of enlarging a wetland area at a different location with persons from the Army Corps of Engineers and State wetlands agency, but there are no approvals or plans in place.

through Aerie Point land into Lake Champlain for the next year while waiting for results from the monitoring wells. The knowledge of EPA officials of the Injunction and the effect of noncompliance is simply unexplained. The Farm has not proved that the EPA action makes compliance impossible.

*Compliance*

The result the Injunction was designed to achieve was to prevent the destructive flushing of water that originates from the tile drain system onto Aerie Point land.

As set forth in the Facts in the January 2024 Decision on the Motion for Contempt, both Gerard and Hans Vorsteveld testified showing that they correctly understood the requirement of the Injunction:

> Hans Vorsteveld stated in an affidavit, "I am aware of this court's August 2022 order that requires Vorsteveld Farm. . .to prevent water from our tile drains from reaching the ditch along Arnold Bay Road." Gerald Vorsteveld testified that he understood that the Injunction meant that the Farm "can't let tile water go into ditches and culverts."

Decision of March 28, 2022, Findings of Fact, page 6.

All of the water continues to flow out of the discharge outlets and proceed downslope to the ditch and on to Aerie Point land. Although a bit of it may be slowed or diverted and seep back into the ground, and some of the sediment and phosphorous may be prevented from reaching Aerie Point land, those effects are minimal. The trespass and nuisance found by the court in March of 2022 continue with ongoing injurious effect.

The Vorstevelds have evolved their own interpretation of what compliance with the Injunction calls for, based on the word "excess" (which does not appear in the Injunction) and on their understanding of a comment made by Aerie Point's attorney during an oral argument on the Farm's Motion for Relief from Judgment. Their interpretation hinges on the word "excess." If the court understands their argument correctly, it is that the Farm believes that it is only required to mitigate 10% of the *overall* water on its land based on the following reasoning: Dr. Joshua Faulkner testified that tile drains remove 10-25% of ground water from the soil; this figure is based on information from the Midwest, which has flat land, so they conclude that the applicable number for Vermont sloping land is 10%. (There is no evidence to support this 10% figure.) Therefore, they contend that as long as 10% of overall water from Farm property is prevented from entering Aerie Point land, the Farm is in compliance.

They believe that once the splitters are in place, compliance will be complete under this standard. (They are apparently excepting the water discharged from outlets ##1–4 involved in the EPA action.) They believe that Aerie Point concedes that it is only this 10% of overall water that

6

is "excess" water subject to the Injunction. Mr. Bannon subscribes to this interpretation and acknowledges that his revised plan is based on it.[6]

There are several problems with this theory. For one thing, it is at odds with the explicit terms of the Injunction, which were formulated carefully to provide a clear enforcement standard. It requires that the water coming out of the tile drain discharge outlets not be permitted to flow into the ditch on the east side of Arnold Bay Road at the bottom of the sloping Farm land. Thus, the Farm could either capture it as it exits from each of the discharge outlets, most of which are uphill, and remove it from there, or let it flow downhill and capture it somewhere above the ditch and remove it from there. In the latter case, the water would probably be mingled with surface runoff from which it could not be separated, in which case all of it would have to be removed in order to ensure removal of the target tile drain water. In either case, it is *all* of the water that leaves the discharge outlets that is required to be removed, not just a portion of it. The December 2023 testimony of both Gerard and Hans Vorsteveld showed that they understood the requirements of the Injunction correctly.

Compliance does not call for reduction of only a percentage of overall water on the land, but requires that all water emerging from the tile drains be prevented from entering Aerie Point land where it constitutes both a nuisance and a trespass. This is not only because of the amount of the water, but also the manner and timing of its discharge, i.e., the velocity it acquires from being concentrated in the drain pipes, causing it to shoot out of the discharge outlets in the first place, and then secondarily being concentrated in the ditch causing it to shoot out of the culverts. The manner of discharge also impacts its quality, as the water may pick up sediment and phosphorous on its downhill journey.

Second, the plain meaning of the court's Decision and related Injunction is that the water to be enjoined is water that would not be running downslope in streambeds to the ditch if no tile drains had been installed on the Farm's land. It is all of the water from the tile drains that periodically goes downhill and causes damage; it is not just a percentage of the overall amount of water on and in the ground on the farmland as a whole. This is the second time that the Farm principals have sought to assert an interpretation of the Injunction that is inconsistent with its terms in an effort to minimize their failure of compliance.[7]

Third, Plaintiff's counsel disagrees that any comment made at oral argument before the Supreme Court signified agreement with the Farm's current interpretation. This court has listened to the full argument before the Supreme Court and concludes that Aerie Point's counsel's

---

[6] His testimony was that his goal has been to reduce the velocity of the water as it moves downhill and mitigate the transport of sediment and phosphorous and that the scope of his plan was to address 10% of the water. There is no evidence that the Farm asked him to design a system that would comply with the actual terms of the Injunction.

[7] See Decision of January 8, 2024, pp 5–6. "It is disingenuous for the Farm to claim that it is not in violation of the Injunction because of a technical argument that the water travels to the ditchline via streambeds rather than directly from the discharge outlets into the ditch." *Id.* at 6.

comment did not signify agreement with the Farm's current interpretation. In any event, any such agreement, if it had occurred, would not change the court order.[8]

The Farm introduced evidence at the hearing that some of the water in the ditch that goes onto Aerie Point land comes from other sources, such as natural seepage or from other properties upslope of Farm land or nearby. Specifically, a video from July 16th, when it rained, showed that significant water flowed down the ditch on Adams Ferry Road from *above* Farm land and was destined for the ditch on Arnold Bay Road and would go through a northern culvert onto Aerie Point land. This water did not originate from the use of tile drains on Farm land. The Farm is correct that Aerie Point cannot attribute such water to it, and cannot complain about such water, just as it did not and cannot complain about the snowmelt or runoff from rains that flowed onto its land prior to the tile drain installation. However, that does not excuse the Farm from compliance with the Injunction. The need for the Injunction results from the enhanced quantity, velocity, and particle-laden character of the water that comes out of the tile drains and runs downhill, into the ditch, and through the culverts onto Aerie Point land on a recurring basis.

In sum, the court rejects the argument made by the Farm that it will soon be in compliance with the Injunction because some mitigating effects from the Bannon plan are projected to impact 10% of overall water. Even if this were true, which has not been proven, it would still not constitute compliance with the terms of the Injunction.

The nuisance and trespass on Aerie Point land continue. While some measures have been taken, none of them show concrete steps either to capture and remove the water as it emerges from the 17 discharge outlets or to capture and remove the water after it has flowed downhill but before it reaches the ditch. There is no evidence that the Farm has asked contractors or engineers to install or design a system for collecting or diverting all of the water exiting from the discharge outlets, as the Injunction requires.[9] Moreover, the impact of the measures does not fulfill the purpose of the Injunction, nor were they designed to do so. They were designed to meet a standard based on a misinterpretation of the purpose of the Injunction, not the terms of the actual Injunction.

The evidence is clear that the Farm wishes to continue to grow corn for the economic purposes of its large-scale farming operation. If the Farm did not grow its own corn, it would have to spend $300,000 annually to buy corn.[10] The Farm has only undertaken any action at all under pressure and only done the minimum it hoped would be sufficient, but it is not enough either to comply with the Injunction or satisfy its purpose.

---

[8] The court continues to be open to amending the Injunction if there is a showing by specific facts that alternative terms would achieve the objective of the Injunction. See Order: Motion for Relief from Judgment (Motion #24), September 21, 2023, pp 5-6; Decision of January 8, 2024, page 5, n.2; and Order: Motion to Amend Judgment (Motion #35), July 3, 2024.

[9] The exception is that Mr. Bannon has proposed designing and installing splitters that would divert water from some of the outlets to percolate in the soil or evaporate, but they are not intended for all the outlets and not intended to remove more than a fraction of the water.

[10] See Decision of March 28, 2022, page 6.

8

In the meantime, it has spent $1.1 million dollars to buy additional land and an expensive new planter. There is no evidence that it could not have used that money to comply with the Injunction. Gerard Vorsteveld estimates that the Farm has spent approximately $60,000 on compliance measures, including materials. This figure includes expenditures for the EPA action, so it is unknown how much relates to the Injunction. The evidence shows that unless the Farm faces significant economic pressure, it will seek to find ways to avoid full compliance.

The essential facts, based on the Findings of Fact set out above, are that:

- Water from the discharge outlets continues to flow downhill through streambeds and into the ditch on Arnold Bay Road and from there on to Aerie Point land on a regular basis at levels of quantity, velocity, and quality that cause damage to Aerie Point land. In other words, the nuisance and trespass have not abated.
- The measures implemented by the Farm have had some mitigating effects, at least at some locations, specifically (a) some dispersal and slowing down of the speed of the downhill flow at some locations, (b) some capture of sediment in the downhill-flowing water, and (c) some reduction in phosphorous in the water that reaches the ditch.
- These mitigating effects are insufficient to prevent the ongoing and regular flow of water from the discharge outlets onto Aerie Point land during rain events in a velocity that is forceful and destructive of Aerie Point land, in quantities that exceed the natural runoff flow that existed prior to the installation of the tile drains and cause erosion of Aerie Point land, and with a brown, murky color and foam, indicating the continued presence of sediment and phosphorous.
- The mitigating efforts, including those that are proposed but not yet implemented, are insufficient to prevent the ongoing harm for which the Injunction was imposed as a remedy for nuisance and trespass.
- The Farm seeks to implement a misinterpretation of the Injunction rather than comply with its actual terms, despite its principals' having an accurate understanding of the requirements of the Injunction.
- The Farm has not pursued compliance with the actual terms of the Injunction with due diligence.
- During the period of contempt, the Farm has spent $1.1 million dollars on purchases of additional land and equipment to enhance its operations. It has spent only a portion of $60,000 on mitigation efforts based on a premise that is a misinterpretation of the Injunction.

**Conclusions of Law**

The legal standards for contempt and enforcement are set forth on pages 6–7 of the Decision of January 8, 2024, and are hereby incorporated as if fully set forth herein. To summarize, once a plaintiff shows that there was a court order that required specific action and that the defendant had actual notice of it and failed to comply, the burden shifts to the defendant to establish by clear and convincing evidence either that it has complied or that it has a defense

9

to contempt, such as inability to comply. For an inability to comply defense, the defendant has the burden of proving, by clear and convincing evidence, impossibility of compliance as well as that it had diligently attempted to comply. See pages 6–7 of the January 8, 2024 Decision for legal authority and case citations.

Aerie Point has shown by clear and convincing evidence that the Farm has not stopped allowing water from the 17 tile drain discharge outlets from flowing into the ditch and culverts westerly of the Farm's land between Adams Ferry Road and Pease Road, and, moreover, that the nuisance and trespass the Injunction was designed to stop have continued.

The Farm claims compliance based on its misinterpretation of the requirements of the Injunction, despite the fact that its principals, Hans and Gerard Vorsteveld, understood the terms of the Injunction correctly. The Farm relies on its interpretation of the purpose of the Injunction based on Plaintiff's attorney's comment at oral argument before the Vermont Supreme Court. Despite the principals' correct understanding of the Injunction, rather than complying, they chose to adopt a misinterpretation that was not consistent with its clearly stated terms nor reasonable. Although the Farm has undertaken efforts to mitigate the effect of its drain tile system, it has not taken action necessary to be in compliance with the clear provisions of the Injunction or prevent the harm it was designed to remedy.

The Farm has not sustained its burden to show that it has pursued diligent efforts to comply with the Injunction as plainly written. For these reasons, the court concludes that the Farm remains in contempt of the Injunction.

*Sanctions*

Plaintiff seeks attorneys' fees, fines, and orders for the Farm to: (a) cut its corn plants and cease corn production, (b) cease all planting of crops other than perennial forage cover or fully protective plant cover, and (c) cease applications of manure on its land.

Attorneys' fees may be awarded "in those exceptional cases where justice demands an award of attorney's fees, such as where a party is unjustly forced to endure a second round of litigation." *Agency of Natural Res. v. Lyndonville Sav. Bank & Tr. Co*., 174 Vt. 498, 501 (2002) (mem.) (citations omitted); *Sutton v. Purzycki*, 2022 VT 56, ¶ 63, 217 Vt. 326.  Plaintiff has been obliged to incur not just a second round of litigation in order to protect its interests, for which it has been awarded attorneys' fees, but a third round. It is entitled to attorneys' fees for the filing of the Supplemental Motion for Coercive Sanctions and the conduct and costs of the hearing thereon.

With respect to Aerie Point's request for coercive sanctions, as noted on page 8 of the Decision of January 8, 2024, the purpose of sanctions for civil contempt is not to punish but to obtain compliance. This is accomplished through fines and imprisonment. As stated in a treatise on remedies by a leading jurist,

The court's power to hold a person in contempt is a power to impose various sanctions of a fairly serious order, including fines and imprisonment. . . The court may . . .sanction contempt by a coercive or remedial fine or imprisonment. A coercive imprisonment is not designed to punish, but is designed to produce action. A coercive fine might be one that accumulated at a certain rate for each day, but stopped accumulating when the defendant obeyed.

Dobbs' Remedies § 2.9.

Plaintiff asks the court to make the Farm stop growing corn and plant hay instead. Plaintiff has not shown that the court has authority to require the Farm to adopt specific agricultural practices on its property. Pursuant to established law on trespass and nuisance, the court has enjoined specific conduct that causes injury to Aerie Point land.

Vermont case law has long approved fines and imprisonment as available remedies for obtaining compliance with injunctive judgments. These remedies are entirely avoidable by the party in contempt and are reasonably enforceable. In *Mayo v. Mayo*, 173 Vt. 459, 463 (2001) (mem.), the Vermont Supreme Court discussed "the coercive nature of the civil contempt mechanism, which, in contrast to criminal contempt, focuses not on punishment but on compelling compliance with a preexisting court order." (Citation omitted). It stated:

The scope of civil contempt sanctions is limited to "compensatory fines or coercive sanctions" such as imprisonment for an indeterminate period. *Sheehan* [*v. Ryea*], 171 Vt. 511, 512 (2000) (mem.) (citation omitted). Such fines or sanctions must similarly be "purgeable, i.e., they must be capable of being avoided by defendants through adherence to the court's order." [*Town of Hinesburg v. Dunkling*, 167 Vt. 514, 526 (1998)] (citation omitted).

*Id*. at 463.

In *Vermont Women's Health Center v. Operation Rescue*, 159 Vt. 141, 149 (1992), the Court wrote that "orders of contempt are discretionary, and we will not reverse unless the court's discretion was withheld or exercised in an untenable fashion." (citing *Persons v. Lehoe*, 150 Vt. 582, 585–86 (1988)).  The trial court in that case had imposed prospective coercive fines of $10,000 per day for the first violation of its order not to block access to a clinic providing abortions and $20,000 per day for further violations.  *Id*. at 151.  Defendants challenged the fines, and the Court stated:

Although purely prospective fines are not favored in Vermont, *State v. Pownal Tanning Co.*, 142 Vt. 601, 606, 459 A.2d 989, 992 (1983), civil contempt fines may be imposed in an appropriate circumstance either to compensate complainants or as a coercive sanction. See *Johnson v. Bednar*, 573 So.2d 822, 825 (Fla.1991) (court may, in its discretion, impose fine unrelated to actual damages to coerce compliance with previously issued court order). When imposed as a coercive sanction, the fine must be purgeable—that is, capable of being avoided by defendants through adherence to the court's order. *Pownal Tanning*

*Co.*, 142 Vt. at 604, 459 A.2d at 991. Further, the situation must be such that "it is easy to gauge the compliance or noncompliance with an order." *Id*. at 606, 459 A.2d at 992.

*Id*. at 151. Although the fines were high, the Court affirmed the trial court's decision because the defendants "did not feel bound by the injunction" and "some coercive sanction is necessary . . . to deter repetition." *Id*. at 152.

In this case, the Farm did nothing meaningful for a year and a half after the Vorstevelds knew and understood the terms of the Injunction. They began efforts only when a hearing on the Motion for Contempt was imminent. They have tried twice to interpret the Injunction in ways to minimize what is required for compliance, despite the clarity of the written Injunction and the visible ongoing harm from their failure to comply. It is clear that a significant coercive sanction is needed for the Farm to take seriously its responsibility for compliance.

In the 2004 case of *Mann v. Levin*, 2004 VT 100, 177 Vt. 261, defendant failed to comply with a restrictive covenant limiting the height of any building constructed on her land. The trial court granted plaintiff a permanent injunction ordering defendant to present the court with a plan to reduce the ridge line elevation of her home by August 1, 2003, and to comply with the height restriction by September 1, 2003. *Id*. ¶ 9. If she failed to comply with either of the deadlines, defendant "would have to immediately vacate the premises and pay $500 per day until compliance was reached." *Id*.

Acknowledging that prospective fines are not favored in Vermont, the Court found that they may be appropriate when "imposed as a coercive sanction," such that they may be avoided by adhering to the court's order, and when it is easy to gauge the defendant's compliance or noncompliance with the order. *Id*. ¶ 32 (citing *Vt. Women's Health Ctr.*, 159 Vt. at 151). Finding that both requirements were met, the Court affirmed the trial court's prospectively identified sanction of a daily fine:

> As of February 2003, Levin was aware that her building violated the restrictive covenant. In April 2003, the court indicated that it would order her to present it with a plan for complying with the covenant, and that it would impose fines should she fail to do so. The court imposed these requirements in its July 2003 order. Levin had ample notice that she would need to develop a plan to reduce the height of her building. Given Levin's attempt to frustrate the covenant, and her ongoing violation of the covenant's terms, the court acted reasonably in ordering Levin to timely comply with its order, and imposing prospective fines to ensure Levin's compliance. We find no abuse of discretion.

*Id*. ¶ 33.

In *Town of Windham v. Reese*, No. 2011-053, 2011 WL 5996017, at *1 (Vt. Nov. 9, 2011) (unpub. mem.), the Town obtained an injunction against landowners whose pond was overflowing and flooding a town road. Downhill neighbors, also affected by the overflow, intervened as plaintiffs. The court ordered landowners to "take immediate steps" to lower the

12

pond by at least 15 feet from the point where it spills over the edge.  *Id*.  Landowners did not take steps to lower the pond level, and the neighbors moved the court to hold landowners in civil contempt.  The court granted the motion based on landowners' failure "to attempt even minimal temporary alleviation of the overflow problem."  *Id*. at \*2.  The court ordered landowners to pay $50 per day until the water level was brought down to at least two feet below the edge and then $20 per day until the level is down to the 15-foot level initially ordered.  *Id*.  The trial court rejected landowners' motions for relief from the fines, finding that landowners had been dilatory in taking any steps to fix the problem.

On appeal, the 3-judge panel stated the following:

We will not disturb the trial court's decision on a motion for relief from judgment "[a]bsent a clear and affirmative abuse of discretion." *Sandgate Sch. Dist. v. Cate*, 178 Vt. 625, 883 A.2d 774, 2005 VT 88, ¶ 6 (mem.). . . .  "Once the trial court has made its findings of fact, and in its discretion entered a judgment of contempt, we will not disturb the judgment unless the court's discretion was entirely withheld or was exercised on grounds clearly untenable." *Vt. Women's Health Ctr. v. Operation Rescue*, 159 Vt. 141, 146–47 (1992) (quotation omitted).

*Id*. at \*3.

In this case, there have been two years of noncompliance following the issuance of the Injunction, and two findings of contempt.  The court prefers to impose the least restrictive remedy that is likely to be effective in bringing about compliance, and to avoid imprisonment if possible. The evidence is clear that unless the Farm faces significant economic pressure, it will seek ways to avoid proper compliance. The Farm benefits economically from disposing of its waste from its tile drain system on to Aerie Point land. To trigger compliance, the economic pressure must be sufficiently strong to affect the Farm's business interests.

The evidence shows that the cost to the Farm of purchasing corn for feed would be $300,000 per year if it did not grow its own corn. That amounts to $822 per day. This suggests that the daily fine should be at least that much in order to prompt compliance. Accordingly, the court hereby imposes a fine of $1,000 per day for as long as the Farm fails to comply with the Injunction. This amount is wholly avoidable by compliance.

Given that the Farm has implemented some mitigation measures which may have had some beneficial effect, albeit based on what appears to be a deliberate misinterpretation of the Injunction, the court will delay the start date of the fine for two months to give the Farm time to come into compliance before the daily fine is triggered. A period of two months appears reasonable for the Farm to take action to comply with the two-year-old Injunction and will likely allow the Farm to obtain the benefit of this year's corn crop. Accordingly, the court will delay the effective date of the daily fine for two months.

This is a civil suit between private parties, with no involvement of governmental bodies charged with regulating the impact of water use. The effect of the Farm's contempt over the last two years has been to continue using Aerie Point's land as a disposal site for its agricultural

waste, thereby causing continued trespass, nuisance, and permanent injury to the land. Therefore, any fines that may accrue will be payable to Aerie Point as compensation for both permanent injury to its property and interference with the use of its property during the period of contempt. Plaintiff may seek judgment periodically, but not more often than once each year. Again, the Farm has the opportunity to avoid fines altogether by compliance within two months.

## Order

Based on the foregoing,

1. Defendant is found in contempt of court.

2. Both Motions (#20 and #32) are granted.

3. Plaintiff is entitled to attorneys' fees in connection with the Motion for Coercive Sanctions; any request must be filed by September 26, 2024, and must be supported by affidavit and time and billing records. If such a request is filed, Defendant may file any objection within 14 days and the court will determine whether a hearing is warranted.

4. If Defendant has not complied with the Injunction by November 15, 2024, a daily fine of $1,000.00 will begin to accrue on November 16, 2024. It will be the responsibility of Defendant to file a motion to show that compliance has been achieved. In the absence of such a motion, the daily fine will continue to accrue.

Electronically signed September 12, 2024 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned